UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:12-CV-00057-JHM

BOODNARINE BOODRAM                                                      PLAINTIFFS
a/k/a MIKE BOOKDRAM, ET AL.

V.

RONALD GLENN COOMES, PHILMO, INC.,                                      DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter came before the Court for a bench trial that commenced on March 20, 2018 and concluded on March 24, 2018. The Court has reviewed the parties' post-trial briefs and the evidence at trial, and its findings of facts and conclusions of law are set forth below.

### I. FINDING OF FACT

This is a story typical of a young couple who, each for their own reasons, are attracted to one another and they decide to engage in a courtship. After expressing their desires and intentions to one another, their excitement grows, ever hopeful their partnership will fulfill their respective hopes and dreams for the future. They decide to move in together, assets are co-mingled and, as is so often the case, the romance fades as they get to know one another better. They try desperately to salvage their relationship but ultimately, they part ways, bitterness ensues, lawyers are hired, and it is left to a Court to clean up the mess. No one ever truly wins in these situations.

And so it was in April 2010, Plaintiff Boodnarine "Mike" Boodram, a business man living in Georgia, started a tape company with Jeff Sundermeyer. Sundermeyer introduced Boodram to the tape business, offering Boodram some old equipment from another company that he and Boodram could use to start up their own tape operation. With Sundermeyer's equipment and

Boodram's financial support, the men got some of Sundermeyer's tape machines running and Apollo Manufacturing Group, Inc. ("Apollo") was born. Apollo would buy imperfect rolls of tape from other manufacturers, rewind them, cut out the imperfections, and sell the tape into secondary markets. Although they incurred a substantial amount of startup costs to get Sundermeyer's equipment running, Boodram testified that within a few months, revenues were picking up.

Despite Apollo trending toward higher revenues, the company was short-lived. Within a few months, Boodram became aware of another opportunity in the tape business. He learned from Sundermeyer that the Defendant Ronald Coomes was interested in selling his tape manufacturing business, Philmo, Inc. ("Philmo"), which he had operated in Franklin, Kentucky since 2005. Coomes had grown weary of his role as President of Philmo and expressed interest in selling the company so that he could pursue other interests.

In August 2010, Boodram and Coomes first communicated by phone. Boodram and three other men – Sundermeyer, Brian Martin, and Brett Orr – presented themselves as a team seeking to take over Philmo. The four men told Coomes of their qualifications, including Boodram, who told Coomes that he had attended Queens College. The team struck up a deal with Coomes and entered into their first letter of intent, outlining a sale of Philmo's assets. Later, after Coomes expressed concerns about working with Sundermeyer and telling Boodram that Philmo could not afford the salaries of all four men interested in buying the company, Sundermeyer, Martin, and Orr were cut out of the deal. Boodram proceeded alone with plans to purchase Philmo.

Boodram wanted to purchase Philmo and Coomes wanted out. Their end goal was the same but the Court is not convinced they ever knew for certain how they were going to get there. They entered into several letters of intent but those terms changed often. Generally speaking, the initial idea was that Boodram would move to Franklin, Kentucky to work at Philmo and learn the

2

business. Initially, the transaction was to close in November 2010. Boodram was to purchase 49% of the business for $150,000 and have time to organize a leveraged buyout for the remaining 51%. In October 2010, Boodram closed down Apollo and came to work at Philmo. On October 1, Boodram paid $50,000. This money was not paid to Coomes personally, rather, it was paid into the company to help with cash flow.

The sale was initially contemplated to be an asset sale, but questions from lawyers and accountants regarding the existing debt changed the structure to a stock sale. This delayed the closing. During this delay, Boodram was running the office according to Coomes. (Tr. Vol. I at 63.)

Another letter of intent was signed by Boodram (on behalf of Apollo) and Coomes (on behalf of Philmo) on December 9, 2010 (Pls.' Ex. 1 and Def.'s Ex. 7, hereinafter, the "LOI".) It called for the purchase price for the remaining 51% to be paid to Coomes over time. According to the LOI, Apollo was to purchase a 49% share of Philmo stock for $200,000 in three separate payments. The first payment of $50,000 was to be paid on November 10, 2010,[1] the second payment of $75,000 was to be paid on December 9, 2010 and a final payment of $75,000 was to be paid on January 10, 2011. Apollo was to seek refinancing on existing Philmo debt, and if successful, Apollo had the right to purchase the remaining 51% share of Philmo stock for $1,492,055.90 in payments to commence in August of 2015 until paid in full by December 2020. Coomes agreed to stay on the Philmo payroll for thirty-six (36) months, receiving an annual salary of $46,000.

On the same day the LOI was signed, Boodram made a second cash contribution of $75,000. This payment brought Boodram's total capital contribution to Philmo to $125,000.

---

[1] Curiously, this December 9 LOI provided for a $50,000 payment in or on November 10, 2010, despite the fact that a $50,000 payment had already been made on October 1, 2010.

Although the LOI called for a final $75,000 payment to be paid in January, it was not made. Boodram testified that the hold up in his last payment was attributed to Coomes, who had arranged for a stock purchase agreement to be drafted. A final payment of $50,000, instead of $75,000, was made on April 5, 2011. Defendant's Exhibit 7 has a notation in Coomes' handwriting that three payments were made totaling $175,000, which was $25,000 short on the cash payments to be made under the LOI. However, as noted earlier, the terms of this deal changed often and it seems, according to Coomes' testimony, that "at the end of the day" the $175,000 cash, plus an allowance of $25,000 for "garbage tape" was the agreed upon consideration for the 49% share, even though this money did not go directly to Coomes individually. (Tr. Vol. I at 56.) At trial, Coomes voiced an objection as to the authenticity of Plaintiff's Exhibit 1. He first questioned the date of the document, and then questioned whether he would have actually agreed to those terms which delayed his complete pay out. In any event, the Court finds the document to be authentic.

Boodram testified that after the execution of the December 2010 LOI, his expectation was that closing would take place on January 10, 2011, when the last payment toward the 49% share was due. However, the closing did not take place because the stock purchase agreement was not yet prepared.

In February, Coomes presented Boodram with a stock purchase agreement. Boodram and his wife, Shelleza ("Shelly") signed a copy of that agreement in March and gave their signed copy to Coomes. (Pls.' Ex. 3 and Def.'s Ex. 1, hereinafter, the "SPA.") Boodram testified that he did not keep a copy of the document he signed. Like the LOI, the SPA provides for Boodram to pay Coomes $200,000 for 49% of Philmo stock. However, despite there having already been $125,000 paid into the company by Boodram, the SPA states that Boodram would pay $75,000 cash at closing and deliver a promissory note to Coomes for $125,000, which would be due and payable

4

on or before April 30, 2015. There is testimony that this provision was written so Coomes would personally receive $200,000 for the 49% share. Defendant's Exhibit 1 contains a promissory note from Boodram and his wife to Coomes and his then wife in the amount of $125,000. In the SPA, Boodram agreed to secure financing to purchase the remaining 51% of Philmo, with a closing to occur on or before August 31, 2012. Section 1.5 of the SPA states that if Boodram leaves his employment at Philmo for any reason or if he fails to manage the company in a manner acceptable to Coomes, Coomes shall reacquire the 49% share from Boodram by paying him one-half the purchase price. Also, if Boodram was unable to acquire financing for the remaining 51%, Coomes was obligated to purchase back the 49% share for one-half the purchase price.

During the bench trial, several different versions of the SPA were presented to the Court. The SPA contained in Defendant's Exhibit 1 has provisions that the remaining 51% of Philmo stock is to be sold to Boodram at a price of One Million Four Hundred Thousand Dollars ($1,400,000.00). In the SPA marked as Plaintiff's Exhibit 3, Boodram's price for 51% of Philmo stock is the same One Million Four Hundred Thousand Dollars, but the parenthetical amount is stated as $1,100,000.00. Also, Section 1.2 of Plaintiff's Exhibit 3 has an acknowledgement that Boodram contributed, as goodwill, inventories and equipment to Philmo with a value of $215,000. Section 1.2 of Defendant's Exhibit 1 does not mention any goodwill contributions. Boodram suspects the version he signed was different from both of the versions presented at trial and he accuses Coomes of changing the terms to become more favorable to him. Boodram questions specifically Section 1.5 of the SPA which states that if he fails to close, he only got back one half of his investment.

Coomes is not exactly certain which version is correct. He testified, "So I believe the contract that made sense yesterday at least that looked right from the standpoint was the one we

5

agreed on, but I still believe that's why no one really knows. It was just too convoluted. An unsophisticated buyer and unsophisticated seller that's trying to make something work will come up with some crazy ideas." (Tr. Vol. IV at 98.) One thing is clear however—the only SPA signed by both parties is the one marked as Plaintiff's Exhibit 3.

It is unclear when the SPA was executed by Coomes. The date written on the agreement is March 31, 2011. Plaintiffs suspect that Coomes backdated the agreement because of a separate agreement that Coomes had with a broker, Gary Soloway. Back in 2010, when Coomes began looking for a buyer for Philmo, he and Soloway entered into an Exclusive Listings Agreement in which Coomes agreed to pay Soloway a brokerage commission upon the sale of Philmo. (*See* Pls.' Ex. 4). Email discussion between Coomes and his attorney, Scott Crabtree, indicate that Coomes took steps to avoid signing the SPA in order to avoid paying a brokerage free to Soloway. (*See* Pls.'s Ex. 26.) This desire may explain the promissory note that Coomes executed in favor of Boodram for $200,000 that was executed on March 31, 2011. (*See* Attachment to Def.'s Ex. 1.) Testimony about this promissory note indicates that its purpose was to make the $200,000 paid into the company by Boodram look like a loan rather than payment toward the purchase of the company. The broker issue may also explain why the transaction did not close as provided in any version of the SPA.

The promissory note from Philmo to Boodram in the amount of $200,000 is a peculiar thing. It is not mentioned in any iteration of the SPA. Boodram testified he never loaned any money to Philmo and that he never requested Philmo to execute a promissory note to him. The only explanation he ever received for the note's existence had to do with the broker's commission. (Tr. Vol. III at 48.) And there is certainly plenty of evidence to suggest that the promissory note was just a charade to disguise the sale and avoid paying the broker a commission. However, when

the parties were trying to salvage their deal, email and text exchanges referred to "your debt" and "my debt" which makes no sense considering the terms of the SPA, because the only promissory note it mentions is Boodram's in favor of Coomes in the amount of $125,000.00. Coomes testified however, that at the end of March, when the SPA was executed by Boodram, Coomes did not think Boodram would ever be able to come up with the rest of the money to buy the company, so he did not feel there was any risk at having to pay a broker. "So I said let's do it. If he comes up with it, then it's worth it to pay the broker right now just to have this thing done. And if he doesn't, then he doesn't. We'll adhere to the notes in the contract and I'll start paying him back." (Tr. Vol. IV at 107.)

The Court questions Coomes' reference to "the notes in the contract" because, as previously mentioned, the SPA only refers to a promissory note from Boodram. Any repayment from Coomes under Section 1.6 of the SPA was to be made within 60 days of default. But, based on the parties conduct and discussions after the break up, it seems as if Coomes believed Philmo was indebted to Boodram, pursuant to the promissory note in the amount of $200,000.00. Coomes said several times that Philmo's loan to Boodram would revert to Boodram's loan to him if the deal was closed. In other words, if Boodram came up with all the money and closed on the deal, Philmo's note would be torn up, forgiven, reverted, whatever, but no money would be owed to Boodram. Presumably, if Boodram did not close on the deal, then Boodram was owed $200,000 pursuant to the promissory note. Perhaps this was what Coomes thought was fair, i.e., Boodram paid $200,000 into the company and the company should pay him back if the deal fell through. However, as noted, none of this was reflected in the SPA.

Plaintiffs also suggest that an email exchange between Coomes and Crabtree indicates that Crabtree was still making changes to the SPA in April 2011. (Pls.' Ex. 26.) The email clearly

7

shows confusion on the part of Coomes as to whether the SPA was fully prepared or not, but Crabtree's response does not conclusively show that there were revisions left to be made. Rather, Crabtree's response "[i]t should not take more than a couple of days, I would guess to schedule this and get it closed, after the time runs" appears to be a reference as to when the deal could close after the brokerage contract expired rather than a direct response to the question actually posed by Coomes---which was how long it would take to get the contract done. Coomes believes Plaintiff's Exhibit 26 is fake. He believes Boodram cut and pasted emails to make him look bad and fit Boodram's theory of case. Coomes offered no direct proof of this, however.

Despite Boodram's execution of the SPA in March of 2011, and his expectation that Coomes would sign it forthwith, he never received a signed copy, until months later. Boodram claims he constantly asked where his stock was and repeatedly asked for a copy of the signed agreement. Again, there is no direct proof of this, however. One would think he would have done more to ascertain matters. The Court does not believe Boodram was concerned about his stock. He was concerned about obtaining financing to purchase the remaining 51%. Boodram knew of the issues related to the broker. He was told about the broker in March. Despite Boodram's testimony, it is reasonable to conclude that Boodram knew there would be no "closing" until June, after the listing agreement expired. (Tr. Vol. II at 156.) But, as we now know, the relationship had soured by June.

Coomes testified that soon after Boodram began working at Philmo, he realized that the two men had very different styles of leadership. Coomes was concerned that Boodram did not seem interested in learning how to make tape. Boodram's focus instead was on selling tape. (Tr. Vol. IV at 92.) Additionally, Coomes felt Boodram's sales strategy was not right for a company the size of Philmo. Coomes felt that Boodram had lied to him about his experience, education,

8

and background.  Coomes was unhappy with Boodram's work ethic, claiming that he never took time to learn the business and that he preferred to work from his office.  To Coomes' disappointment, Boodram was more focused on numbers and figures and spent most of his time working alone on business plans.

Coomes also claimed that Boodram was an inadequate manager of Philmo.  For example, Boodram advised Philmo employees to add double adhesive to an order of tape to make the tape twice as sticky.  Coomes and other employees insisted that anyone knowledgeable about tape would have known that doubling the adhesive would not make the tape twice as sticky but instead, would make the product unusable.  Clearly, they were correct because the customer returned the tape order complaining that they could not even remove the tape off the roll.  Philmo was forced to issue a full refund.

There were also complications from Boodram trying to split time between Franklin, Kentucky where Philmo was located, and Georgia, where his family lived.  Coomes stated that it was his impression that Boodram was going to move to Franklin to take over the business.  Boodram and his wife, Shelly, were open to that option at the beginning, meeting with a realtor to look at houses and telling their family and employers in Georgia of their intentions to move.  Yet the Boodrams never moved to Kentucky.  Coomes rented a furnished apartment in Franklin where Boodram stayed while he was working.  On the weekends, Boodram would return to his family in Georgia.  Coomes complained that over time, Boodram's weekends in Georgia began to stretch into the work week and eventually, Boodram was only in the office a couple days a week.  When Coomes criticized Boodram for the time spent in Georgia, Boodram told Coomes, "[T]he letter of intent did not say I have to move to KY."  (Pls.' Exhibit 21.)

9

Sometime in June 2011, Philmo had a meeting with its biggest customer, 3M. Although Boodram had prepared a Powerpoint presentation to be used during the meeting, Coomes made it clear to Boodram that he was not invited to attend. Coomes admits that this was around the time that he told Boodram not to return to work and stopped giving him a paycheck. Coomes testified, "I was starting to have a problem with sending money—wiring money to Mr. Boodram every week and seeing no results." (Tr. Vol. IV at 99.) This did not come as a complete shock to Boodram. He testified that the relationship had been deteriorating since his last cash payment was made in April of 2011. In June 2011, Coomes told Boodram to bring all the money or else not to return at all. (Tr. Vol. II at 161.) Yet, even, during that time, Coomes told Boodram he was still "invited to come to the factory and look at anything that would help him purchase the company." (Def.'s Resp. [DN 262] ¶ 29.)

Despite their deteriorating relationship and being told not to return, Boodram continued trying to work deals for Philmo. (Tr. Vol. II at 160−161.) Boodram was still bringing investors up to visit the company. (*Id.* at 166.) When asked why, at that point, he was bringing investors up to Franklin, Kentucky, Boodram testified, "[s]till in that same, you know, mode. Let's get the money, you know, let's do whatever we can to do the deal." (*Id.*)

In the following months, Coomes and Boodram were in contact, mostly by email and text messages, trying to salvage something from their broken arrangement. Although neither seemed pleased that their deal had not gone as expected, the tenor of those discussions can best be shown by Boodram's email of July 8, 2011, in which he stated, "Let's continue to date but not live together…Make it work, we are big boys and business man [sic]". (Pls.' Ex. 20.)

Boodram complains now that he was not able to get financing after having been locked out of the company. However, the Court does not believe that Boodram's efforts after the lock out

10

were focused on purchasing Philmo pursuant to the terms of the SPA. Instead, Boodram's focus quickly shifted to getting paid back the money he had put into Philmo, plus costs incurred in shutting down Apollo, and obtaining a trademark so he could market Patriot tapes in the future. His email of July 8, 2011, to Coomes outlines his plan. (Pls.' Ex. 20 at 3.) Coomes never understood why he was on the hook for anything having to do with shutting down Apollo, but there is evidence in a July 15, 2011 email that Coomes felt an obligation to repay Boodram the cash he had put into the company, "as soon as you and I can come to a deal." (Pls.' Ex. 21.) In that same email chain, Boodram said he would accept $200,000 and wipe the other loss "if I can stay in the game and sell" presumably under the Patriot brand. (*Id.*)

It appears that through the remainder of 2011, Boodram acted as a broker of sorts, made deals, and sent them to Coomes. Much of their interaction can be found in Plaintiffs' Exhibit 23, which is a compilation of text messages back and forth. Coomes agrees to pay back $200,000.00 on October 3, 2011 and asks Boodram to send him a copy of the loan and letter of intent stating, "I may have a solution." (Pls.' Ex. 23.) On October 24, 2011, Boodram asked Coomes for a copy of the loan "you have." (*Id.*) On October 25, 2011, Scott Crabtree sent Coomes the signed SPA. Coomes sent it on to Boodram the same day, saying "[h]ere is what was at my attorney's office." (Pls.' Ex. 24.) Boodram stated that he was thrilled to finally see an executed copy of the SPA. He replied to Coomes, "This show[s] you sold me the stock and 125k promise from me to you. Nothing on the 200k deposit you turn into a loan with me.. according to this you own [sic] me some shares.. boss man, when can I start working again.. I am ready.." (Pls.' Ex. 24.) Coomes responded, "[y]ou can buy the entire thing any time you would like big dawg." (*Id.*)

Boodram said his happiness was short-lived "because how do you get back to that point, you know, because you've been locked out, things have really gone bad, you're trying to do

11

business, you're trying to salvage it….but at least I knew that I had an executed agreement." (Tr. Vol. II at 206.) At this point, Boodram says his chances of securing financing were not good. He claims he would have had more success had he known he had an executed agreement. (*Id.* at 207.)

Despite Boodram's claims, on November 25, 2011, he texted Coomes the following: "I have raised some money to buy you out but not all over [sic] it. Only 800k is on the table. You decided [sic] to rework the deal or head to court to settle. If we rework we all can get what we want here." (Pls.' Ex. 23 at 7.) Again on December 15, 2011, Boodram texted Coomes, saying "I have raised funds to do the deal." (*Id.*) Coomes' response was "[y]ou got backing to buy this place that will work but let's not play around this time. What do you need before we set a meet?" (*Id.* at 8.) Boodram's response was "[j]ust you sweetheart. You need to respond to the lawyer letter and see if you will remove those claws [sic] or come up with something better anyways your headed to sweet home al early next year." (*Id.*) To which, Coomes replied "show me the money and I'm gone." (*Id.*) The "lawyer letter" mentioned above was discussed briefly at trial, but it was not introduced as an exhibit. Boodram was attempting to renegotiate some of the terms of the SPA that were contained therein, presumably, the ones that only required Coomes to repay half of Boodram's contribution. Unfortunately, however, the two never agreed to new terms.

After several failed attempts to settle the matter, Plaintiffs filed this lawsuit on April 27, 2012. After nearly six years of litigation, the Court held a bench trial. Plaintiffs Mike Boodram, Shelly Boodram, and Apollo were represented by their original attorney who filed the lawsuit in 2012. Coomes had a series of different attorneys throughout the litigation but was unrepresented by counsel at trial. Coomes represented himself *pro se* and Philmo was unrepresented.

## II. CONCLUSIONS OF LAW

Since the bench trial, Plaintiffs have briefed the claims they wish to pursue against Coomes. Plaintiffs argue that Coomes has committed fraud, securities fraud, and breach of contract. The Court will discuss each claim in turn.

### Fraud

In Kentucky, a claim of fraud requires that the plaintiff prove: (1) material representation; (2) which is false; (3) known to be false or made recklessly; (4) made with inducement to be acted upon; (5) acted in reliance thereon; and (6) causing injury. *UPS v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Throughout the lawsuit, Plaintiffs have argued that Coomes fraudulently induced Boodram to sign the SPA by giving false assertions that he intended to sell Boodram the company. Plaintiffs purport that by the time Coomes presented the SPA to Boodram for signature, he had no intention of selling Philmo to Boodram.

The Court is not persuaded that Coomes made false or reckless representations when negotiating with Boodram. To the contrary, the evidence shows that Coomes hoped that the deal would go through so he could have a way out of Philmo. Boodram signed the SPA back in March 2011, relying on Coomes' word that Philmo would be his. Although Coomes may have already had doubts about Boodram's qualifications to run the business at that point, Coomes still had every intention of following through with the stock purchase sale if Boodram could find the funds to finance the deal. For this reason, the Court does not believe that Coomes used fraud to induce Boodram to sign the SPA.

In addition, although the Court finds it likely that Coomes did not actually sign the SPA on March 31, back-dating the agreement was not an effort to defraud Boodram. Rather, email conversations between Coomes and Scott Crabtree indicate that Coomes' decision to wait to sign

13

the SPA was based on Coomes' efforts to avoid paying a brokerage fee. For these reasons, the Court does not find that Coomes used fraud to induce Boodram to enter into an agreement for the sale of Philmo.

### Securities Fraud

Likewise, the Court finds no evidence of securities fraud. The basic elements of a securities fraud claim under both federal and Kentucky law are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance (or transaction causation); (5) economic loss; and (6) causation. *Brown v. Earthboard Sports USA*, Inc., 481F.3d 901, 917 (6th Cir. 2007).

Once again, the Court does not believe that Coomes intended to make any misrepresentations in negotiating the stock purchase. To the contrary, Coomes had every intention to uphold the SPA and get out of the tape business. Under the provisions of the SPA, Coomes understood Boodram to own 49% of Philmo stock after Boodram made his $75,000 payment in April 2011. Coomes testified that Boodram "had 49 percent in the books at the attorney's office." (Tr. Vol. I at 170.) Although Boodram claims that he never saw proof of his shares, there is no evidence that he asked for documentation of his 49% ownership until after he left Philmo. Moreover, the Court is convinced that Coomes would have sold Boodram the remaining 51% of Philmo shares if Boodram had come up with the financing to complete the purchase. For this reason, there is no viable claim for securities fraud.

### Breach of Contract

First, it must be noted that Plaintiffs only seek to enforce the December LOI, arguing that "the December LOI represents the only contract between the [parties.]" (Pls.' Brief [DN 259] at 11). Plaintiffs assume this position by arguing that "Coomes did not sign the SPA and deliver it

to Boodram, and never intended to sign it and comply with its terms." (*Id.*) Coomes takes a different position. According to Coomes, the LOI was simply the intent of the parties, only meant to serve as a placeholder until the "actual contract" (the SPA) was agreed upon. (Def.'s Brief [DN 262] at 9.) He contends, "The December LOI was no longer valid after the execution of the SPA in March 2011." (*Id.*)

As to the LOI, Kentucky law is particularly strict when it comes to the enforceability of letters of intent. "To be enforceable and valid, a contract to enter into a future covenant must specify all material and essential terms and leave nothing to be agreed upon as a result of future negotiations." *Cinelli v. Ward*, 997 S.W.2d 474, 477 (Ky. Ct. App. 1999). In *Cinelli*, the lead case for Kentucky's rule on the enforceability of preliminary agreements such as letters of intent, the Kentucky Court of Appeals found that a preliminary agreement was unenforceable because "(1) throughout negotiations, the parties modified or attempted to modify the Agreement's settled terms (including the ultimate purchase price), and (2) the Agreement itself contemplated the possibility that the deal might never close." *Id.* at 478. Likewise, the Sixth Circuit applied Kentucky law to find that a letter of intent was unenforceable because, among other reasons, "the parties left the consummation of the deal dependent on the completion of due diligence and regulatory approval" and "the terms of the agreements specifically contemplated the possibility that the deal could fall through." *Giverny Gardens, L.P. v. Columbia Hous. Ptnrs. L.P.*, 147 Fed. App'x 443, 449 (6th Cir. 2005). In so concluding, the Sixth Circuit noted that "the traditional Kentucky rule is clear— preliminary agreements such as the letter of intent in this case are unenforceable." *Id.* at 450.

In this case, the LOI was just one of several letters of intent that made up preliminary negotiations for the sale of Philmo. The Court does not find it to be a final and enforceable agreement between the parties. Rather, the bare-bones, one-page document lays out a general plan

15

with schedules, milestones, and general agreements but has none of the detailed terms that are typically found in a complicated contractual agreement such as the sale of a business. Like the letter of intent in *Giverny Gardens*, the LOI contemplates that the deal may not occur, making the sale of Philmo "contingent upon a satisfactory physical verification inventory of the raw materials, WIP and the finished goods and Fixed Assets as of the date of the closing of the deal or earlier, as may be mutually decided by the parties concerned." (LOI [DN 1-1]). For this reason, the Court concludes the LOI is not an enforceable agreement.[2]

Although the Court finds it likely that Coomes did not sign the SPA until sometime after his brokerage contract expired, Coomes assented to the terms outlined in the SPA by delivering it to Boodram to sign. Even without signing the SPA, Coomes made his intent clear that he wished to be bound by the deal outlined in the draft SPA.

> The rule is stated in 17 Am.Jur.2d, Contracts, Sec. 70, p. 408. "In the absence of a statute requiring a signature or an agreement that the contract shall not be binding until it is signed, parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated." See also Carter v. Hall, 191 Ky. 75, 229 S.W. 132 (1921).

*Cowden Mfg. Co. v. Systems Equipment Lessors, Inc.*, 608 S.W.2d 58, 61 (Ky. Ct. App. 1980). Therefore, even before Coomes signed the document, there was a sufficient meeting of the minds between Boodram and Coomes in order to make the SPA a valid and enforceable agreement between the parties. Thus, the SPA controls the agreement between the parties.

Next, the Court must determine whether either party breached the SPA. "Under Kentucky law, in order to recover in any action based on breach of a contract, a plaintiff must show the existence and the breach of a contractually imposed duty." *Ky. Farm Bureau Mut. Ins. Co. v.*

---

[2] Furthermore, the SPA contains a merger provision which states, "This Agreement contains the entire understanding between and among the parties and supersedes any prior understandings and agreements among them respecting the subject matter of this Agreement." (SPA § 10.5.)

*Blevins*, 268 S.W.3d 368, 374 (Ky. Ct. App. 2008). In this case, Boodram was to pay $200,000 in the form of $75,000 cash and a promissory note for $125,000 to Coomes in exchange for a 49% interest in Philmo. On the same day that the SPA was signed, Boodram executed a promissory note to Coomes for $125,000 that was personally secured by him and his wife. Then, on April 5, 2011, Boodram contributed another $75,000 to Philmo, although it was not all in cash. Both parties testified that Boodram was $25,000 short on cash so Coomes agreed to accept some tape products that Boodram had instead of the final $25,000 in cash (although Coomes testifies that the "garbage tape" he accepted was not actually worth $25,000).

None of the money contributed by Boodram went personally to Coomes. It all went into the company. The SPA contemplated the payment of new money directly to Coomes himself. Despite the fact that no new money ever went to Coomes as contemplated, both parties agreed at trial that Boodram upheld his end of the bargain and was entitled to a 49% share of Philmo.

Plaintiffs argue that "Coomes never conveyed Boodram his 49% interest in the company, a clear breach of the agreement." (Pls.' Brief at 11.) Coomes argues that although no physical stock certificates were exchanged, he did uphold his promise, stating that Boodram "still got his 49 percent interest in the company, like I promised he would, to help him get the money." (Tr. Vol. I at 54.)

Boodram complains that Coomes' failure to deliver stock certificates caused him to be unable to secure financing for the purchase of the remaining 51% of Philmo because he had no tangible proof of his 49% ownership. The Court is unpersuaded. First, there is no evidence that any attempts by Boodram to secure financing were frustrated by his not having tangible proof of his ownership interest in Philmo. Furthermore, there is no evidence, other than Boodram's self-serving testimony, that Boodram ever asked for any tangible proof of his 49% ownership until well

17

after he had already left the company. Coomes confirms that Boodram never asked for his stock until after he left Philmo. Coomes testified that Boodram "had 49 percent in the books at the attorney's office." (Tr. Vol. I at 170.) The Court does not find the failure to deliver stock certificates to Boodram a constitutes material breach of the SPA.

Nor does the Court find that Coomes' refusal to allow Boodram to return to work after June 2011 is a breach of the SPA. Boodram, at times, argued that his 49% ownership entitled him to continued employment. However, the SPA speaks directly to that issue giving Coomes absolute discretion in that regard. Thus, Coomes was within his rights to tell Boodram not to return to work.

### III. DAMAGES

Although the Court did not find fraud or that the SPA was breached, the agreement provided guidance in the event the deal fell through. In accordance with Section 1.5 of the SPA:

> Should Purchaser, Boodnarine Boodram, fail to actively manage the Corporation, in Seller's sole discretion, or should he leave the employment of the Corporation for any reason, Seller shall re-purchase any and all stock acquired by Purchaser for one-half of the original price paid by Purchaser to Seller by and through this Agreement. Further, if Purchasers fail to purchase the remaining fifty-one percent (51%) of the Corporation, and fully close the transaction with Seller by or before August 31, 2012, Seller shall be required to re-purchase all stock acquired by Purchaser by, through and/or under this Agreement from Purchasers for an amount equal to one-half (1/2) of the original price paid by Purchasers to Seller by, through, and/or under this Agreement.

(SPA § 1.5.) Both parties acknowledge that Boodram paid Coomes the $200,000 purchase price required for Boodram to buy 49% of Philmo stock. The SPA detailed this purchase price being paid through $75,000 in cash and a $125,000 promissory note. Although no payments were ever made under the promissory note, both parties testified throughout the trial that the payments made before the SPA was signed satisfied the other $125,0000 payment. Boodram made two cash

18

payments totaling $125,000 into Philmo, one for $50,000 in October 2010, and another for $75,000 in December 2010.

The other payment required for purchase of the initial 49% of Philmo under the SPA was made in April 2011. Although the SPA states that Boodram should pay $75,000 in cash, Coomes agreed to accept only $50,000 in cash and $25,000 worth of tape products. All in all, both parties agree that Boodram paid $200,000 to purchase 49% of Philmo stock.

Therefore, in accordance with Section 1.5, the Seller, Coomes, must repurchase the 49% of stock acquired by Boodram at one half of the original price paid. Coomes owes Boodram $100,000.00.

## Punitive Damages

Plaintiffs have also asked the Court to award them punitive damages. However, as the request for punitive damages was predicated on a finding of fraud or securities fraud−neither of which the Court found in this case−punitive damages are not appropriate.

## Attorney's Fees

Plaintiffs have also asked this Court to award attorney's fees on the basis of their claim for securities fraud. Kentucky's securities fraud statute allows for a defrauded party to recover "reasonable attorney's fees determined by the court." Ky. Rev. Stat. § 292.480(7). However, because this Court has determined that Coomes did not commit any securities fraud violation, Plaintiffs are not entitled to attorney's fees on the basis of this statute.

## IV. CONCLUSION AND ORDERS

Accordingly, based on the findings of fact and conclusions of law set forth above, **IT IS HEREBY ORDERED** that judgment be entered against Defendants and in favor of Plaintiffs in the amount of $100,000.00.

Joseph H. McKinley Jr., District Judge
United States District Court

November 21, 2018

cc: counsel of record
    Ronald Glenn Coomes, *pro se*